UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 07-50132 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| THOMAS BURLEY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**INTRODUCTION**

This matter is before the court pursuant to an indictment charging defendant Thomas Burley with being a felon in possession of a firearm. Mr. Burley has filed a motion seeking to suppress the physical evidence seized from his apartment and statements he made to law enforcement. [Docket 17]. The government opposes the motion.  Mr. Burley's motion was referred to this magistrate judge for a report and recommendation pursuant to Chief Judge Karen E. Schreier's standing order dated June 11, 2007, and 28 U.S.C. § 636(b)(1)(B).

**FACTS**

An evidentiary hearing on Mr. Burley's motion was held on Monday, October 20, 2008.  Mr. Burley and his attorney, Monica Colbath, were present as was the attorney for the government, Assistant United States Attorney Gregg

Peterman.  Three witnesses testified in person at the hearing:  Officer Jennilyn Oster, Officer Eddie Rodriguez, both of the Rapid City Police Department, and Sargent Kraig Wood of the Pennington County Sheriff's Office.  The court finds the following facts from the evidence presented at the hearing.

On August 18, 2007, Jennilyn Oster was a police officer on patrol with the Rapid City Police Department.  She had served as a law enforcement officer for approximately 18 months at this time.  Shortly after 4:00 a.m., Officer Oster received a call from dispatch advising that a 19-year-old male was reporting that he had just been raped at a residence at 1522 Mt. Rushmore Road. Officer Oster met with the victim at a gas station on Mt. Rushmore Road approximately a block away from the scene of the alleged rape.

The victim described to Officer Oster the location of the rape, including a description of the interior of the residence in which the rape occurred.  He also gave Officer Oster a physical description of the man he alleged had raped him. The victim told Officer Oster that the man who raped him lived on the main floor of 1522 Mt. Rushmore Road and that he had a roommate who lived upstairs.

Two other Rapid City Police Officers responded to the dispatch call to provide assistance to Officer Oster.  She entrusted the victim to the care of one of these officers and positioned the officer and the victim in Officer Oster's patrol vehicle approximately one-half of a block away from 1522 Mt. Rushmore

2

Road.  Officer Oster told the other officer that she would make contact with the suspect and that the officer should drive by the residence with the victim to see if the victim could identify the suspect.  The second officer, Eddie Rodriguez, waited outside the residence.

Officer Oster then traveled to 1522 Mt. Rushmore Road, which is on the northeast corner of the intersection of Mt. Rushmore Road and Franklin Street. She walked around the home first, noting that there were three exterior doors. Two of these doors were at ground level, with one facing west towards Mt. Rushmore Road and the second door facing south towards Franklin Street.

A third door was located on the second story of the home, also facing south towards Franklin Street.  An exterior wooden staircase led from this second-story door to a wooden landing four feet nine inches from the ground. Officer Oster described the wood of which the stairs and landing were constructed to be rotted, with most of the paint having flaked off, and to be very nearly falling apart.  There were no stairs connecting the wooden landing to the ground.  Furthermore, the landing itself was cordoned off with a chain.

While walking around the house on the outside, Officer Oster observed no markings indicating that there was a separate apartment upstairs.  She observed no separate mailboxes.  She observed no separate doorbells.  She observed only one utility meter on the outside of the house.

3

Officer Oster went to the ground floor door facing Franklin Street and began knocking on the door in an attempt to make contact with the residents inside.  After approximately 15 minutes, Barry Teal came to the door.  Mr. Teal stepped out into the driveway with Officer Oster.  Officer Oster explained that she had received a report of a rape at the residence earlier that morning and that she was there to investigate.  Mr. Teal responded that only he and his roommate were in the residence.  While Officer Oster and Mr. Teal were in the driveway, the other officer drove by with the rape victim in the patrol car.  The victim identified Mr. Teal as the person who had raped him.

Officer Oster asked Mr. Teal if he would agree to go down to the police station to talk to detectives about the rape allegation.  Mr. Teal agreed.  Officer Oster also asked Mr. Teal if they could look around his house.  Mr. Teal agreed that they could.  Mr. Teal tried calling his roommate, Thomas Burley, the defendant in this action, on his cell phone from the driveway.  Officer Oster allowed him to attempt to contact Mr. Burley in this way.  Mr. Teal was not successful in getting Mr. Burley on the phone.

Mr. Teal told Officer Oster that he wanted to go inside the house to retrieve some clothing.  Officer Oster indicated that she would go with him.  Officer Oster indicated that she had three reasons for wanting to accompany Mr. Teal on his mission to retrieve clothing.  First, Mr. Teal had given his permission for her to look around his house and she wanted to do so.  Second,

4

Teal was accused of a violent crime and she wanted to make sure he did not go into the house and retrieve a weapon.  Third, Officer Oster testified that she considered the house to be a crime scene and she wanted to make sure that Teal did not destroy or disturb any evidence, either purposefully or inadvertently.

The two entered the house together.  Officer Oster noted that the interior of the house was consistent with the rape victim's description.  She followed Mr. Teal through the main floor and back to his bedroom.  In the bedroom was a spiral staircase leading up to the second story of the structure.  There was no door or other closure or obstruction at the base of the stairwell in Teal's bedroom.

In the bedroom, Officer Oster observed a pair of pants on Teal's bed and she picked them up to examine them.  Teal then became very anxious and told Officer Oster that he did not want her to search.  Officer Oster agreed not to search until a search warrant could be obtained.  She explained that she would simply take steps to preserve the crime scene until such a warrant was issued.

While both Officer Oster and Teal were in Teal's bedroom, Teal called up the stairwell to Mr. Burley in the room above, notifying Mr. Burley that there were police in the house.  Approximately 10 minutes later, Mr. Burley came down the spiral staircase in what Officer Oster thought to be his pajamas.  She heard no door open or close upstairs before Mr. Burley's entry.

Officer Oster introduced herself to Mr. Burley and the two then moved into the living room where further conversation took place. Officer Oster told Mr. Burley that she was there to investigate a reported rape that was alleged to have occurred in the house earlier that morning. Office Oster asked Mr. Burley where he was the night before. Mr. Burley responded that he had arrived home at about midnight and gone to bed. He said he heard nothing after that.

Officer Oster then told Mr. Burley that police were going to obtain a search warrant to search the home. She gave Mr. Burley the option of staying put in a stationary location in the home during the search, or of leaving. Mr. Burley indicated that he wished to shower, obtain some clothing from his room upstairs, and leave to go to work. Officer Oster indicated that an officer would accompany him upstairs. Mr. Burley became very anxious upon hearing this information, he began pacing and acted very agitated. He told Officer Oster that he could go upstairs and retrieve his stuff and that the police did not need to go with him.

Upon observing Mr. Burley's demeanor and reaction to the suggestion that a police officer would accompany him upstairs, Officer Oster suspected that Mr. Burley might have evidence upstairs which he intended to destroy or disturb, or that he might retrieve a weapon while upstairs. During the course of his conversation with Officer Oster, Mr. Burley never protested that his room upstairs was a separate dwelling.

6

Officer Oster asked Officer Rodriguez to accompany Mr. Burley upstairs to get his clothing.  She also asked Officer Rodriguez to secure the residence while the search warrant was being obtained.  Officer Oster indicated that she intended to leave with the victim to have a rape kit performed at the hospital. By "secure the residence," Officer Oster testified that she intended to convey the message that Officer Rodriguez should make sure no evidence was destroyed or disturbed and that once Mr. Burley left the premises, no one else entered the home.

Officer Rodriguez, an officer with the Rapid City Police Department for approximately 21 years, was also on patrol in the early morning hours of August 18, 2007.  Despite his seniority over Officer Oster, Officer Oster was in charge of the investigation at 1522 Mt. Rushmore Road because she had been the primary responder to the dispatch report.

Officer Rodriguez made himself available for assistance, but kept his distance until called upon at the scene.  He was not present during Officer Oster's conversation with the rape victim and was not made aware of the details of the victim's report other than that there had been an allegation of a rape.  He responded directly to 1522 Mt. Rushmore Road (he did not go to the gas station where the victim and Officer Oster first met), and saw Officer Oster knocking on the door and then talking to Barry Teal in the driveway.  Officer Rodriguez was not privy to the conversation between Oster and Teal.

Some time after Officer Oster had entered the home, Barry Teal left the home and then Officer Rodriguez entered.  He did not overhear the entirety of Officer Oster's conversation with Mr. Burley, but he did overhear Oster tell Burley "this is a crime scene," and he heard Mr. Burley respond that he wanted to take a shower, retrieve some personal belongings, and go to work.  Officer Oster asked Officer Rodriguez to accompany Mr. Burley upstairs to his room while he retrieved his things.

At this point, Officer Rodriguez did not know where within the house the rape victim had alleged that the crime took place.  In addition, although he understood Officer Oster's statement that "this is a crime scene" to refer to the whole house, he was unclear of what the parameters of the crime scene were.

Officer Rodriguez followed Mr. Burley through the ground floor to Barry Teal's bedroom.  Mr. Burley led the way into that bedroom and then up a circular staircase in the bedroom that led to the second floor.  It was still early in the morning and the light was dim.  Officer Rodriguez testified that the circular staircase went from Teal's bedroom directly into the bedroom on the second floor with no doors or obstructions at either end.  In the dim light, the only two things Officer Rodriguez remembers seeing were Mr. Burley's bed and an open closet (a rod for hanging clothes affixed to the wall with no enclosures around it).  The entire second floor was one large room with no subdivided spaces.

8

Although Officer Rodriguez did not notice other details of Mr. Burley's living space at the time, Sargent Wood established that Mr. Burley's living space had the following additional details on August 18, 2007.  There was a full-sized refrigerator.  There were also a sink, a toilet, and a shower stall, although these fixtures were not enclosed in a separate room.  Also, the exterior door on the second story was jammed shut from the inside with a device intended to prevent the door from being opened from the outside.

Once upstairs, Mr. Burley moved into the area near his bed and reached into a dark corner.  Officer Rodriguez became concerned for his own safety, thinking that Mr. Burley might be retrieving a weapon.  He grabbed Mr. Burley's wrist and then saw that Mr. Burley had only his wallet in his hand.  Officer Rodriguez never opened the wallet, never looked though the wallet, but simply gave it back to Mr. Burley when he saw that it did not pose a threat to him.  He did comment on how fat the wallet was.  Mr. Burley stated that he had $3,000 in cash in the wallet because he had recently won some money gambling.

Mr. Burley then moved over to the clothes hanging on an open rod.  He retrieved a shirt with no incident.  He then reached into a pocket of some dress pants and in a quick and furtive gesture, hid his hand behind his back while simultaneously glancing at Officer Rodriguez to see if he was being watched.

Officer Rodriguez, again fearing for his safety, grabbed Mr. Burley's hand. Mr. Burley opened his hand and revealed several bindles of cocaine.

Officer Rodriguez arrested Mr. Burley, handcuffed him, and took him downstairs. He read Mr. Burley his <u>Miranda</u>[1] rights and Mr. Burley agreed to waive those rights and talk to Officer Rodriguez. Based on Mr. Burley's further statements, Officer Rodriguez retrieved additional bindles of cocaine and a "snort tube" from the upstairs room.

Subsequent to these events, a state court judge issued a search warrant for 1522 Mt. Rushmore Road. During the execution of that search warrant, a firearm was found in the stand next to Mr. Burley's bed on the second floor. It is that firearm that forms the basis of the present indictment. Mr. Burley alleges that the contraband Officer Rodriguez caught him with, as well as his subsequent statements to Officer Rodriguez, were used in the application for the state court search warrant.

## DISCUSSION

Mr. Burley's argument for suppression hinges entirely on Officer Rodriguez's entry into Mr. Burley's living space at 1522 Mt. Rushmore Road. Mr. Burley moves to suppress not only the drugs and paraphernalia found during that warrantless entry, but also the warned statements he subsequently gave to law enforcement as well as the firearm found when the search warrant

---

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

was executed.  Mr. Burley argues that Officer Rodriguez's warrantless entry into his living area was a violation of his rights under the Fourth Amendment and, therefore, the drugs discovered during that warrantless entry should be suppressed.

Mr. Burley's argument in favor of suppression of the statements and the firearm are derivative:  he argues that, because the original warrantless search was violative of the Fourth Amendment, therefore the statements and firearm are "fruit of the poisonous" tree that must also be suppressed.

A.     **General Fourth Amendment Principles**

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures..." U.S. CONST. amend. IV. "Generally, to search a private place, person, or effect, law enforcement must obtain a warrant supported by probable cause from a judicial officer."  United States v. Sanders, 341 F.3d 809, 818 (8th Cir. 2003) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).  The same proposition holds true for the seizure of property–"[g]enerally, police officers must have a warrant before they can seize a person's property."  United States v. $7,850.00 in U.S. Currency, 7 F.3d 1355, 1358 (8th Cir. 1993) (citing United States v. Place, 462 U.S. 696, 701 (1983)).  A search or seizure conducted by the government without a warrant is presumptively unreasonable.  United States v. Kimhong Thi Le, 474 F. 3d 511, 514 (8th Cir. 2007); United States v. Cedano-Medina, 366 F.3d 682,

684 (8th Cir. 2004).  "The touchstone of the Fourth Amendment's promise is 'reasonableness,' which generally–though not always–translates into a warrant requirement."  <u>United States v. Hatten</u>, 68 F.3d 257, 260 (8th Cir. 1995) (citing <u>Veronica School Dist. 47J v. Acton</u>, 515 U.S. 646, 653 (1995)).

Because the "overriding principle of the Fourth Amendment is one of reasonableness," the courts have created "logical and flexible" exceptions to the warrant requirement.  <u>United States v. Martin</u>, 806 F.2d 204, 206 (8th Cir. 1986).  "A warrantless search of a private place can survive constitutional inhibition only upon a showing that the surrounding facts brought it within one of the exceptions to the rule that a search must rest upon a search warrant."  <u>United States v. Heisman</u>, 503 F.2d 1284, 1287 (8th Cir. 1974) (citing <u>Jones v. United States</u>, 357 U.S. 493, 499 (1958)).  "When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception."  <u>United States v. Reidesel</u>, 987 F.2d 1383, 1388 (8th Cir. 1993).

If the search or seizure violates Fourth Amendment principles, the "exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search."  <u>Murray v. United States</u>, 487 U.S. 533, 536 (1988) (citations omitted).  "[T]he exclusionary rule also prohibits the

12

introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.' " Id. at 536-537 (quoting Nardone v. United States, 308 U.S. 338, 341 (1939); and citing Wong Sun v. United States, 371 U.S. 471, 484-485 (1963)).

**B.      Securing the Premises**

The government attempts to justify the warrantless entry into Mr. Burley's living space by arguing that Officer Rodriguez was simply securing the dwelling until a search warrant could be obtained.  The government urges that Officer Rodriguez was allowed to follow Mr. Burley to ensure that evidence was not destroyed or removed and that, when Mr. Burley made the furtive movement behind his back while simultaneously glancing quickly at Officer Rodriguez, a legitimate issue of officer safety was created.  The government relies on United States v. Ruiz-Estrada, 312 F.3d 398 (8th Cir. 2002), and United States v. Roby, 122 F.3d 1120 (8th cir. 1997), to support its argument.

In Ruiz-Estrada, surveillance of the defendant's apartment led officers to believe that drug trafficking was taking place there.  Ruiz-Estrada, 312 F.3d at 400-402.  After arresting an individual who had just come from the defendant's apartment with two ounces of cocaine, police traveled to the defendant's apartment and secured the apartment while a search warrant was obtained. Id.  While securing the apartment, the police discovered the defendant

13

watching television in the apartment.  Id.  In addition, the police obtained information from the defendant's girlfriend, who was also present, confirming that she rented the apartment and lived there and that the individual arrested with the cocaine had recently left the apartment.  Id.  Police used both statements from the girlfriend in their application for the search warrant.  Id.

The defendant moved to suppress the evidence seized from the apartment upon execution of the search warrant.  Id. at 404.  He argued that the police lacked exigent circumstances justifying their entry into the apartment and that the police exploited their presence in the apartment in order to obtain information to use in the application for the search warrant.  Id. The Eighth Circuit affirmed the district court's denial of the suppression motion, noting that the police acted reasonably in securing the apartment pending the issuance of the search warrant because they had reliable information that narcotics were being sold out of the apartment and there was a risk that evidence might be destroyed.  Id.  After reviewing the affidavit in support of the application for the search warrant, the Eighth Circuit also rejected the argument that police had exploited their presence in the apartment while securing it.  Id.

In Roby, the defendant, who police suspected of being involved in drug trafficking, was ensconced in a hotel room.  Roby, 122 F.3d at 1122.  A drug dog walked the hall outside the defendant's room two or three times, making a

14

positive alert on each pass at the defendant's room.  Id.  Some officers left to apply for a search warrant while other officers knocked on the defendant's door, intending to secure the room in anticipation of receiving the search warrant.  Id. at 1122-1123.  Upon knocking on the defendant's door and identifying themselves, the officers heard a toilet flush inside the defendant's room before he answered the door.  Id. at 1123.  Defendant then opened the door to the officers.  Id.  While awaiting the search warrant, the police did not restrain the defendant's movement–in fact he left unaccompanied to obtain a soda–and did not question or search the defendant.  Id.  Later, upon executing the search warrant on the room, police discovered 10 kilograms of cocaine.  Id.

Roby moved to suppress the drugs, arguing that the fruits of the search warrant were fruit of the poisonous tree which emanated from the earlier, warrantless entry into his room.  Id.[2]  The Eighth Circuit rejected this argument, holding that the officers had a reasonable belief that evidence might be destroyed.  Id. at 1125.  In addition, the court noted that the officers merely preserved the space and checked to assure their own safety without taking any investigative steps or restricting the defendant's freedom of movement in any way.  Id.

---

[2]Roby also argued that the drug dog sniff as well as earlier encounters between him and police were illegal.  Those grounds for suppression are not relevant to Mr. Burley's motion and, hence, will not be discussed.

The <u>Roby</u> court cited to <u>Segura v. United States</u>, 468 U.S. 796 (1984).  In

<u>Segura</u>, the United States Supreme Court was called upon to decide "whether,

when officers have probable cause to believe that evidence of criminal activity is

on the premises," the Fourth Amendment permits police to temporarily secure

a dwelling in order to "prevent removal or destruction of evidence."  <u>Id.</u> at 809.

Without deciding whether securing a dwelling constituted a "seizure" under the

Fourth Amendment, the Court noted that "[d]ifferent interests are implicated by

a seizure than by a search.  A seizure affects only the person's possessory

interests; a search affects a person's privacy interests."  <u>Id.</u> at 806.  The Court

ultimately concluded that, where officers had probable cause to believe that

evidence of a crime was inside a dwelling, the Fourth Amendment permits

police to secure the dwelling to prevent destruction or removal of evidence

while a search warrant is being secured.  <u>Id.</u> at 810.

While the officers' presence in the preceding cases did not violate the

Fourth Amendment, <u>United States v. Madrid</u>, 152 F.3d 1034 (8th Cir. 1998),

provides an example of police who impermissibly exploit their presence inside a

house they are ostensibly merely "securing."  In <u>Madrid</u>, the Eighth Circuit held

that the officers' conduct went beyond merely securing the premises and

became exploitative, so much so that the court invalidated the subsequent

search pursuant to a warrant because it was based, in part, on that

exploitation.  <u>Id.</u> at 1041.  The conduct of the officers was as follows.  In

16

anticipation of obtaining a search warrant, the officers went to Madrid's home to secure it.  Id. at 1035-1036.  While there, they seized four occupants, searched them, emptied their pockets and seized the contents, told them they were not free to leave, and prohibited them from talking to each other.  Id. at 1036.  The officers also searched cushions on the sofa, went upstairs and to the basement two or three times, searched through mail and personal documents in the kitchen, and looked through a notebook.  Id.  Some of what the officers observed in their wanderings around the house was incorporated into the affidavit in support of the search warrant.  Id.

The court invalidated the warrantless entry, noting that there had been no finding of exigent circumstances and the defendant whose home it was was arrested in a location that was "nowhere near his home."  Id. at 1039.  Based on the totality of circumstances, the court held that the officers exploited their presence in Madrid's home because their actions went far further than necessary to simply secure the residence and the fruits of their illegal entrance into the home formed part of the probable cause which supported the subsequent search warrant.  Id. at 1040.

Mr. Burley acknowledges that police are allowed to secure a crime scene pending the issuance of a search warrant.  In addition, he does not take issue with whether there was probable cause to believe that evidence of the rape would be found on the premises.  However, he argues that his own living space

17

was a separate dwelling and that the officers knew that and had no right to intrude into that space in order to secure the crime scene.  Since Officer Rodriguez had no legal right to intrude into Mr. Burley's living space, argues Mr. Burley, he "created" the issue of officer safety by his illegal presence and, hence, it cannot form the justification for the seizure of the drugs and paraphernalia.

In support of his argument, Mr. Burley argues that the physical aspects of the residence at 1522 should have put officers on notice that Mr. Burley's living space was a separate residence and not part of the crime scene.  In particular, Mr. Burley urges the fact that there was a separate, exterior entrance to his second-floor room.  He also points out that his room, although all one big living space, contained a full-sized refrigerator, a sink, a shower stall, and a toilet.  Furthermore, Mr. Burley points out that Officer Oster never indicated that the rape victim told her that the rape had occurred upstairs in Mr. Burley's room.

The government counters with the fact that the exterior exit to Mr. Burley's room was not functional as the stairs leading from this exit ended nearly five feet above ground.  A chain across the stairs discouraged use of these stairs.  The exterior door was barricaded from within to prevent the door from being opened.  Officer Oster described the exterior stairs as rotting and bereft of paint.  The inside stairs, which were apparently used by Mr. Burley to

access his living space, were located in the interior of his roommate's bedroom.
There was no marking on the inside or the outside of 1522 Mt. Rushmore Road
that would indicate there were two separate dwellings within.  There were
notseparate mailboxes or doorbells.  There was only one utility meter on the
outside of the building.[3]

       As an initial matter, the court rejects Mr. Burley's suggestion that his
room had an independent exit to the outside from the second floor.  The stairs
which led to the exterior door on the second floor were obviously not in good
repair and not used, cordoned off as they were by a chain across a landing
which ended five feet above the ground.  The court adds her own observation of
Mr. Burley at the hearing:  he is approximately five feet eleven, approximately
230 pounds, and appears to be in his mid-fifties.  Only an agile man with a bit

_____

       [3]In regard to the physical aspects of 1522 Mt. Rushmore Road,
Mr. Burley asserts that whether Officers Oster or Rodriguez had a reasonable
belief that the upstairs represented an entirely separate dwelling should be
judged from the knowledge they had as of the early morning hours of August
18, 2007.  Mr. Burley cited no legal authority in support of this position.
However, the disputed elements–whether there was a chain across the landing
on the exterior stairs, whether Mr. Burley's living space had bathroom facilities
and a kitchen, whether there were multiple doorbells, whether there were
multiple utility meters, and whether there were any markings anywhere
designating Mr. Burley's living space as a separate apartment–are not really in
dispute.  Contemporaneous photographs taken at or close by in time to August
18, 2007, demonstrate what the physical features of the house were at the time
the officers were investigating.  Furthermore, Mr. Burley was not able to
establish that Officers Oster and Rodriguez were definitively not aware of these
physical features on August 18, 2007.  Rather, the cross-examination of these
witnesses established only that, some 14 months after the event, the witnesses'
memories are now faded as to what they noticed and what they did not notice
on August 18, 2007.

of gymnastic ability could have sprung up to the landing from the ground, and jumping down to the ground from the landing would pose not a little peril for someone of Mr. Burley's size, shape, and age.  It is clear to the court that neither Mr. Burley nor anyone else used these outside stairs to reach Mr. Burley's living space.  The court considers the facts, then, setting aside the idea that Mr. Burley had an independent exit to the outside world.

In an analogous case, United States v. Nichols, 344 F.3d 793 (8th Cir. 2003) (*per curiam*), police obtained a search warrant for a single family residence based on an affidavit that a confidential informant had made three controlled buys from Glenn Nichols inside the home.  Id. at 795-796.  The description of the place to be searched included the phrase, "attached rear garage converted into a room."  Id. at 796.  Upon entering the home to execute the search warrant, occupants told the officers that Nichols was not inside the home, that he lived in the attached garage which had been converted into a room.  Id. at 796-797.

The door to Nichols' room was locked.  Id. at 797.  Police knocked and announced and, when no answer was received, forced the door open.  Id.  Contraband was found inside Nichols' room.  Id.  Nichols moved to suppress the evidence seized from his room, arguing that his room was an apartment separate from the rest of the house which the search warrant had not described with particularity.  Id.  Nichols argued that the search of his room

20

violated his rights under the Fourth Amendment's prohibition on unreasonable searches and seizures. Id.

The Eighth Circuit stated that the Fourth Amendment requires that a search warrant describe the place to be searched with sufficient particularity so as to "enable the executing officer to locate and identify the premise with reasonable effort, . . . [without] any reasonable probability that another premise might be mistakenly searched." Id. (quoting United States v. Gitcho, 601 F.2d 369, 371 (8th Cir. 1979)). "The authority to search granted by a warrant is 'limited to the specific places described in it and does not extend to additional or different places.' " Id. (quoting United States v. Pennington, 287 F.3d 739, 744 (8th Cir. 2002) (quoting United States v. Alberts, 721 F.2d 636, 639 (8th Cir. 1983)). "When a warrant specifically mentions certain structures, it authorizes the search of those structures and any other property not noticeably separated from them." Id.

In support of his motion to suppress, Nichols introduced a document from the Missouri Department of Revenue showing his address as "apartment 1G," and proved that he paid rent for his room and kept a separate lock on the door. Id. at 798. The court stated that these facts, in isolation, might be sufficient to show that Nichols' room was a separate place, but that other facts in the record contradicted these facts. Id. The court noted that there was no marking on the door identifying it as an apartment, Nichols' room had no

21

bathroom or kitchen in it, and the post office did not have an apartment registered at the address.  Id.  In addition, the court held that the description in the search warrant describing the premises to be searched as including the "attached rear garage converted into room" was sufficient to indicate to the officers that the search warrant covered Nichols' room and, thus, to satisfy the Fourth Amendment.  Id.

Here, the court finds that the unique facts of this case support the legality of Officer Rodriguez's entry into Mr. Burley's living space as a legitimate effort to secure the crime scene.  First of all, both the victim and Barry Teal described the relationship between Teal and Mr. Burley to be that of "roommates."  Typically, persons who reside in completely separate apartments would not describe themselves as "roommates," a term that usually denotes two or more persons who share the same living space.  See Webster's Ninth New Collegiate Dictionary at 1023 (1984) (defining "roommate" as "one of two or more persons sharing the same room or living quarters.").  Nothing about the physical aspects of 1522 Mt. Rushmore Road would have alerted the officers to the idea that the structure housed two separate dwellings.  Thus, it was reasonable for the officers to conclude that the house was a single dwelling.

Also, Officer Oster's interactions with Mr. Burley raised legitimate suspicions that Mr. Burley might have evidence secreted upstairs in his room, and that he wanted to keep police from that evidence or destroy or dispose of

the evidence.  Although Officer Rodriguez was not privy to this information, nonetheless, he overheard Officer Oster tell Mr. Burley that "this is a crime scene."

Officer Rodriguez reasonably understood Oster's statement to refer to the entire house.  The court characterizes Officer Rodriguez's understanding as "reasonable" because: (1) he did not know where the rape was alleged to have occurred within 1522 Mt. Rushmore Road and (2) given the layout of the house, Mr. Burley could not exit or enter his own living space to the outside without crossing through the area inhabited by his roommate, which indisputably was the crime scene.  Whether the rape occurred upstairs or downstairs, Mr. Burley's exiting from the house would require transgressing both areas.  Thus, to secure the crime scene, Officer Rodriguez was required to observe Mr. Burley's actions throughout until he was safely outside the structure.

The facts concerning whether Mr. Burley's living space was a separate dwelling are ambiguous, but given the mode of entry and egress to Mr. Burley's area, no officer could be faulted for believing that the premises was really a single family dwelling or that the upstairs might be part of the crime scene.  See Nichols, 344 F.3d at 798; United States v. Davis, 557 F.2d 1239, 1247-1248 (8th Cir. 1977) (stating that where officers have reason to believe a

residence to be a single family dwelling under the control of one person, search would not be invalidated even if in fact there were separate apartments).

Much is made by Mr. Burley of the fact that Officer Oster allowed the suspected rapist to attempt to call Mr. Burley on his cell phone from the driveway outside to alert him to the fact that the police were at the home and that she did not immediately upon entering the home insist that Mr. Burley be brought downstairs.  Mr. Burley argues that these actions show that Officer Oster did not consider Mr. Burley's living space part of the crime scene which needed to be secured.

Perhaps.  However, after speaking to Mr. Burley and observing his reactions to police presence in the home, Officer Oster certainly *did* consider the upstairs a potential part of the crime scene.  Officer Oster did not have the benefit of this information (Mr. Burley's reaction to police presence), when she was making her earlier decisions concerning Mr. Burley.  Finally, the court also notes that an equally plausible explanation for Officer Oster's actions prior to encountering Mr. Burley in person is that she was simply inexperienced–she had only been a police officer for approximately 18 months.  As she candidly acknowledged at the hearing, she probably made some mistakes in investigating this matter.  Thus, the fact that Officer Oster allowed the suspect to attempt to telephone Mr. Burley and the fact that, upon entering the home, Officer Oster did not immediately remove Mr. Burley, do not conclusively prove

24

that Officer Oster did not consider Mr. Burley's living space to be part of the crime scene which needed to be preserved.

The court concludes, based on the above facts and law, that the warrantless entry by Officer Rodriguez into Mr. Burley's living space was justified as an attempt to secure the scene of a crime.  Officer Rodriguez did not exploit his presence there.  He sought only to preserve the status quo and his own safety until he could get Mr. Burley out the door.  Had Mr. Burley not attempted to secrete contraband out of the house right in front of Officer Rodriguez, Officer Rodriguez would have left the premises at 1522 Mt. Rushmore Road exactly as he found it (minus the few personal effects Mr. Burley needed in order to go to work).  This is not a case like the one the court faced in Madrid where the officers, once present in the house, actively searched and investigated.  Instead, the court finds the facts of this case more in line with those in Roby, Segura, and Ruiz-Estrada, where the officers' presence was within the limits set by the Fourth Amendment.

**C.    Statements and Evidence Seized When the Search Warrant Was Executed**

Mr. Burley raises no independent challenge to the admissibility of his statements to police.  His only argument for suppression of his statements is that they are derivative of the asserted illegal warrantless entry into his living space and, thus, should be suppressed as the fruit of that earlier illegal search.

25

Likewise, Mr. Burley raises no independent challenge to the search warrant.  He does not argue that the search warrant lacked probable cause. Instead, he seeks to suppress the evidence seized pursuant to the execution of the search warrant as fruit of the earlier warrantless entry which he asserts violated the Fourth Amendment.

As described above, the court has already concluded that Officer Rodriguez's warrantless entry into Mr. Burley's living space did not violate the Fourth Amendment.  Accordingly, Mr. Burley's argument that his statements and the firearm should be suppressed because they are derivative of that asserted illegality must fail because no illegality occurred.

## CONCLUSION

Based on the foregoing facts and the law, the court recommends that Mr. Burley's motion to suppress [Docket 17] be denied in its entirety.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the

26

district court.  <u>See Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

      Dated October 21, 2008.

              BY THE COURT:

              /s/ *Veronica L. Duffy*

              VERONICA L. DUFFY
              UNITED STATES MAGISTRATE JUDGE